**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

Jason Lindner,

                      Plaintiff,

v.

Donatelli Bros. of White Bear Lake
d/b/a Donatelli's,

                      Defendant.

Civ. No. 13-2160 (RHK/LIB)
**MEMORANDUM OPINION
AND ORDER**

Phillip M. Kitzer, Michelle Dye Neumann, Brian T. Rochel, Schaefer Halleen LLC, Minneapolis, Minnesota, for Plaintiff.

Martin D. Kappenman, Gregory L. Peters, Seaton, Peters & Revnew, PA, Minneapolis, Minnesota, for Defendant.

## INTRODUCTION

In this action, Plaintiff Jason Lindner alleges his former employer, Defendant Donatelli Bros. of White Bear Lake ("Donatelli's"), discriminated against him on the basis of his disability, failed to accommodate his disability, and terminated his employment in retaliation for filing workers' compensation claims and requesting medical leave. Donatelli's now moves for summary judgment on his claims, and for the reasons explained below, its Motion will be granted in part and denied in part.

## BACKGROUND

The following facts are recited in the light most favorable to Lindner.

Donatelli's is an Italian-American restaurant and caterer in White Bear Lake, Minnesota. Trish Appleby is co-owner of Donatelli's and responsible for all personnel

decisions. Lindner worked for Donatelli's for eighteen years in various positions, from when he was first hired in 1995 until he was fired in February 2013. Beginning 2004, he worked as a prep cook from 4 a.m. until 2 p.m. Friday through Monday, opening the restaurant, cleaning the lines, and preparing food.

**Lindner's Job Performance**

Lindner was never written up for performance issues and did not recall any other communication regarding performance issues either. Appleby rated his performance as "average" and considered him to have "performance problems." (Appleby Dep. at 31.) She explained that since he switched from an hourly to a salaried position in August 2012, he had "some sort of crisis" every week or two requiring him to miss work—for example, his child fell off a bunkbed, his wife has asthma, he cracked a tooth, or his mother fell. (Id. at 32.) Because of this, she did not consider him a dependable employee. She testified that if he had continued to miss work often for "personal reasons" it "[c]ould have led to his termination or it could have led to him going back as an hourly employee." (Id. at 33–34.) She testified that "the number of [days he had to take off] and how they came grouped together after the change in his pay was beginning to be just a little too unbelievable." (Id. at 45.) She believed she had talked to Lindner about missing work, but could not recall specifically. (Id. at 32.)

**January 11th Injury**

On Friday, January 11, 2013, Lindner arrived at work at approximately 3 a.m. He backed his car into an icy parking spot across from the restaurant, so the rear of the car was facing the curb and the front of the car was facing the restaurant. (Lindner Dep. at

109.) When he opened the car door and stepped out with his left foot, his foot slipped under the car and his knee hit the ice. (Id. at 110.) He fell to the ground, with his right leg still in the car, then crawled out and stood up. (Id. at 110–11) He felt an instant of pain, but it quickly dissipated to just a "tinge" and he was able to walk across the parking lot normally, enter the restaurant, take some ibuprofen, and begin working. (Id. at 111.) He claims his knees were wet as a result of the fall. (Id.) As the morning proceeded, his back and hip began to stiffen and hurt. (Id. at 114.) He developed a limp that worsened as the morning progressed. (Id. at 115–16.) When his coworkers arrived later, he told them about the incident, saying he crawled around on the ground and that the security tape should be on "America's Funniest Home Videos." (Id. at 118.) When Lindner's supervisor, Rita Johnson, arrived around 9 a.m. she noticed he was limping, a coworker told her what happened to Lindner, and she asked if he wanted to get it checked out. (Id. at 120–21.) He agreed and left work and visited Dr. Amer Azar. (Id. at 121.)

Dr. Azar told him he probably sprained or strained the ligaments in his knee and hip and should stay off it for a couple days. (Id. at 122.) He gave Lindner a note for two days off work. (Id.) The "objective findings" documented in Dr. Azar's note provided "Patient appears to be in mild to moderate pain." (Id. Ex. 1.) The note further provides, under "Hip exam":

> Gait:  limping (no trendelenburg gait), no leg length discrepancy
> ROM: internal rotation full external rotation painful
> FABER test negative FADIR test negative
> Palpation:  no tenderness on the trochanteric bursa, no palpation of the SI joint, no joint tenderness.
> Motor:  normal muscle strength in the lower extremities.
> Sensation:  intact.

(Id.) Lindner sent a text message to Johnson indicating he sprained his hip and knee and had to stay home for two days. On Monday, January 14, he returned to work, still limping.

Appleby learned of Lindner's injury on the 11th when it occurred. Lindner's coworkers told her about it and none of them told her they thought he was lying, but she was immediately "skeptical." (Appleby Dep. at 44–45.) When he returned to work on January 14, Lindner told her about the fall and described it "pretty much the same way" as his coworkers had. (Id. at 47.) She suspected the injury would qualify for workers' compensation, but she did not call Donatelli's insurance agent or make any other attempt to report the injury, and Lindner did not seek any benefits for it. (Id. at 57; Lindner Dep. at 122.)

**January 20th Injury**

Less than a week later, on Sunday, January 20, Lindner arrived at work at approximately 3:30 a.m. When he entered, there was a bleach bucket in the sink soaking towels and an extra bleach bucket soaking a moldy pan. (Lindner Dep. at 81–82.) When Lindner walked into the kitchen area, he noticed a strong bleach smell, but he continued doing his work. (Id. at 26.) He believed the smell was due to the bleached towels in the sink, so he dumped them out and ran hot water to try to dissipate it. (Id. at 26–29.) When he did this, the smell was overpowering and he began coughing. (Id. at 29–31.) He moved away and his cough became deep and coarse. (Id. at 31.) He went outside and then returned, refilled the bucket, and wrung out the towels. (Id. at 32–33.) At that point, he felt like everything inside him was burning. (Id. at 33.) He felt his nose burning and

his chest become tight. (Id.) His breathing became labored and although he could talk, it was difficult. (Id. at 34.) Over the next hour, his breathing became worse. (Id. at 35.) Around 4 a.m., he turned on the exhaust fans. (Id. at 27–28.)

When a coworker arrived at 5 a.m. he asked her if she could notice a smell and told her it smelled very strongly of bleach when he arrived. (Id. at 36.) Lindner was a smoker and joined the coworker outside for a cigarette; he said it was a struggle to smoke and he has not had another cigarette since. (Id. at 38.) He called Johnson to report the problem and told her he "walked into a chemical cloud," his lungs were burning, and he was coughing up blood. (Id. at 26.) He told her he needed to go to the emergency room and she agreed. (Id. at 39.) Lindner left work and drove to the emergency room, where he received two nebulizer treatments and a chest x-ray. (Id. at 47–48.) He told the doctor that he had inhaled bleach "at a friend's house" to avoid a workers' compensation claim. (Id. at 44–47.) His symptoms improved but he continued to cough; the doctor instructed him not to return to work that day. (Id. at 50; Kitzer Aff. Ex. 12.) He returned to Donatelli's to explain the situation to Johnson and give her the doctor's note. (Lindner Dep. at 52.) He then went home and performed a nebulizer treatment every four hours that day. (Id. at 54.)

**Workers Compensation, FMLA, and Appleby's Investigation**

The next day, Lindner went to his doctor, Dr. Albert Salizar, who prescribed him prednisone and nebulizer treatments and sent him to a lung specialist. Lindner also went to the dentist that day for a previously scheduled appointment and had four fillings done. (Id. at 62.) He told Appleby that his doctor had excused him from work for the following

- 5 -

week but had not diagnosed the problem.  (Id. at 59.)  She told him to switch the claim over to workers' compensation.  (Id. at 68.)  When Appleby reported the injury to Donatelli's insurance carrier, the insurance representative, Michelle Skrede, requested a site visit for later that week.  When Skrede came, Appleby mentioned Lindner's fall in the parking lot and Skrede told her that would qualify for workers' compensation and she should file a claim for it.  (Appleby Dep. at 52–54.)

After the visit, Appleby pulled the security camera footage for both injuries and sent copies to Skrede.  (Id.)  She also watched the footage herself.  While she thought everything on the tape from January 20th "looked normal," she decided the tape was "inconclusive" and she "did not know at that point" if he was lying about the inhalation injury.  (Id. at 98.)  But after reviewing the tape from January 11th multiple times, she did not see Lindner fall as he described and concluded it was "clear" that he had fabricated the knee and hip injury.  (Id. at 99–101.)  To be sure, she requested documentation of the injury from him.

Around the same time, on January 28th, Dr. Salizar excused Lindner from two more weeks of work for his inhalation injury.  (Id. Ex. 4.)  Lindner informed Appleby of this and she drafted an FMLA form for him to complete, which stated he was eligible for FMLA leave beginning January 22, 2013.  (Id. at 79 & Ex. 5; Appleby Dep. at 173.)  On February 11th, Lindner sent Appleby his completed FMLA paperwork and Dr. Azar's note from the January 11th fall.  Appleby reviewed the doctor's note and did not believe it contained any "objective" evidence substantiating his injury.  (Id. at 102–04.)  At that point, she "had no doubt in [her] mind" that he was "lying" about the fall and the

resulting injury.  (Id. at 104.)  The next day, she sent him a letter terminating his employment.  When Lindner requested a reason for the termination, Donatelli's counsel responded that his employment had been terminated "because [Donatelli's] reasonably believed you provided false information related to an alleged January 11, 2013 injury and related workers' compensation claim."  (Kappenman Aff. Ex. E.)

Although Appleby testified that Donatelli's "always tr[ies] to communicate with the employees" when there is a problem (Appleby Dep. at 18), she never informed Lindner (prior to his termination) that she believed he was lying.  Nor did she give him an opportunity to attend an Employee Assistance Program called "TEAM," to which she had referred other employees she believed had behavioral problems.  (Id. at 20.)  For instance, when she caught another employee lying to her and drinking on the job, she offered to send him to TEAM instead of immediately terminating him.  (Id. at 19.)  Another employee threw a steel bowl across the kitchen and she sent him to TEAM instead of terminating him.  (Id. at 21–22.)

Lindner also contends that his termination was suspicious because those other employees had not filed workers' compensation claims and no employee had taken FMLA leave[1] since 2003.  Additionally, Appleby understood that reporting workplace injuries, especially those that resulted in missed days of work, increased Donatelli's insurance premiums.  Lindner contends this gave her motivation to retaliate against him for filing workers' compensation claims.

---

[1] To be fair, it is unclear whether Donatelli's employees were eligible for FMLA leave between 2003 and 2014, as Appleby testified it did not always maintain 50 or more employees, which is a prerequisite to FMLA coverage.

After his termination, Lindner settled his workers' compensation claims, won unemployment benefits, and commenced the instant action against Donatelli's. He asserts eight claims total under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq.* ("MHRA"), the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and the Minnesota Workers' Compensation Act, Minn. Stat. § 176.82 ("WCA"). Donatelli's now moves for summary judgment. The Motion has been fully briefed and is ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009). The moving party bears the burden of showing that the material facts in the case are undisputed. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Beard v. Banks, 548 U.S. 521, 529–30 (2006); Weitz Co. v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

**I.   ADA/MHRA**

The ADA and MHRA[2] prohibit employers from discriminating against employees on the basis of disability. 42 U.S.C. § 12112(a); Minn. Stat. § 363A.08, subd. 2. Lindner alleges he was disabled by his January 20th injury and asserts two types of claims under these statutes: Donatelli's failed to reasonably accommodate his disability, and Donatelli's retaliated against him for requesting accommodation.

**A. Failure to Accommodate**

"An employer commits unlawful discrimination . . . if the employer does 'not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer].'" Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 951 (8th Cir. 1999) (quoting 42 U.S.C. § 12112(b)(5)(A)). For purposes of this Motion, Donatelli's does not dispute that Lindner was disabled. Instead, it challenges whether he was a "qualified individual" and whether he requested accommodation. A qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment positions that such individual holds or desires." 42 U.S.C. § 12111(8). After his inhalation injury,

---

[2] For all purposes relevant to this Order, claims under the ADA and MHRA are analyzed in the same fashion; accordingly the Court's analysis encompasses Lindner's claims under both statutes. See Somers v. City of Minneapolis, 245 F.3d 782, 788 (8th Cir. 2001) ("Claims under the MHRA are analyzed the same as claims under the ADA.").

Lindner's doctors limited him to working in an "environment free of chemical smells," to avoid aggravating his RADS. (Kappenman Aff. Ex. B ("Per pulmonologist will need an environment that is free from bleach and ammonia smells secondary to his lung condition.").) Lindner conceded in his deposition that Donatelli's (like most restaurants) is not free of bleach and chemical smells. Donatelli's argues, therefore, that he could not perform the essential functions of his job there.

However, "qualified individuals" include individuals who are only capable of performing the essential functions of a job *with* reasonable accommodation. Lindner contends that he would have been able to continue working at Donatelli's had they allowed him to take time off work and then return to his job using a respirator. In his deposition, Lindner testified that he believed, based on his experience working there for nearly twenty years, he would have been able to perform his duties as a prep cook if he had been allowed to use a respirator. (Lindner Dep. at 161.) So there is a genuine issue of fact as to whether Lindner was a "qualified individual."

Donatelli's also disputes whether he requested accommodation. The burden is on the employee to request accommodation from the employer. Ballard v. Rubin, 284 F.3d 957, 960–61 (8th Cir. 2002). A request for accommodation need not be in writing or use "the magic words 'reasonable accommodation,'" but it "must make clear that the employee wants assistance for his or her disability." Id. at 962.

Here, Lindner requested time off of work for his injury, which can be a form of reasonable accommodation under the ADA. See Brannon v. Luco Mop Co., 521 F.3d 843, 849 (8th Cir. 2008). Lindner's claim as to this request fails, however, because

Donatelli's *granted* the request—it allowed him to go to the hospital right away after the injury, then stay home for the day, and the following week, and then for two more weeks. Donatelli's never denied a request for medical leave, thus, it cannot form the basis of a failure-to-accommodate claim.

The only other possible basis for his claim is that Donatelli's did not allow him to return to work with a respirator. However, it is undisputed he never requested such an accommodation, so this argument is also a nonstarter. Because Lindner has not offered proof that Donatelli's failed to accommodate his alleged disability, these claims under the ADA and MHRA will be dismissed.

### B. Retaliation

Without direct evidence, Lindner's retaliation claim is analyzed using the McDonnell Douglas burden-shifting framework. To establish a prima facie case, Lindner must show (1) he engaged in protected conduct, (2) he suffered an adverse employment action, and (3) a causal connection between the two. Lors v. Dean, 746 F.3d 857, 867 (8th Cir. 2014). If he does, the burden shifts to Donatelli's to proffer a legitimate, non-retaliatory reason. Id. Then, the burden shifts back to Lindner to present evidence that the proffered reason was pretextual. Id.

*i. Prima facie case*

Lindner engaged in protected conduct by requesting an accommodation (time off from work) and there is no dispute he suffered an adverse employment action (termination). As for a causal connection, he contends the timing of his termination is evidence of retaliation. Lindner was discharged approximately three weeks after his

(allegedly) disabling injury and one day after submitting his FMLA leave request for it. These events occurred sufficiently close together to establish a prima facie case. Id. at 866 (the Eighth Circuit has refrained from drawing a definitive line, but has recognized two months is too long and two weeks is sufficient) (citing Sisk v. Picture People, Inc., 669 F.3d 896, 900 (8th Cir. 2012) and Smith v. Allen Health Sys., Inc., 302 F.3d 827, 833 (8th Cir. 2002)).

   *ii. Non-retaliatory reason*

In response, Donatelli's has offered a legitimate, non-retaliatory reason: Lindner lied about his January 11th injury. In support, it cites Appleby's testimony that she thought he was lying; her comments to Skrede on Lindner's workers' compensation claim to that effect; the security footage from that morning, which it contends shows that Lindner did not fall, have wet knees, or limp until coworkers showed up; and Lindner's doctor's note, which it asserts shows most "objective" signs of injury were negative. As even Lindner concedes, dishonesty is a legitimate reason for disciplining or dismissing employees. So the burden shifts back to Lindner to show Donatelli's reason is a pretext for retaliation.

   *iii. Pretext*

To prove pretext, a plaintiff must show that the employer's proffered reason is unworthy of credence. Lindner first argues that Donatelli's reason lacks a basis in fact.

"A finder of fact may infer an improper motive from evidence of the falseness of an employer's proffered justification . . . . This evidence . . . tends to show a causal link between the protected conduct and the adverse action, and it also tends to show that the

justification given by a defendant was pretextual." Hudson v. Norris, 227 F.3d 1047, 1051–52 (2000) (citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000)). Appleby testified that she believed Lindner lied about his fall and concluded he was lying after she watched the video footage and saw the doctor's note. But Lindner pokes several holes in this testimony.

First, although she claims her belief was based on objective evidence, she admits she was immediately skeptical of his injury, even though the account he gave to her and to his coworkers was "pretty much the same."

Second, and more importantly, the video footage and doctor's note contradict her testimony. The Court has reviewed the video footage, and while Lindner's fall is not apparent on the tape, not much else is apparent either. The tape depicts Lindner's car entering the lot, backing into a parking spot, the headlights turning off, and the driver's side door opening; nothing is visible behind the door for a few seconds until Lindner stands up behind it, closes the door, and walks toward the building. In the Court's view, it is impossible to make out what Lindner was doing between the time the door opened and the time he stood up. He could have just as easily been on the ground as sitting in his car. Given the poor image quality, the darkness, and the tape skipping every several seconds, a jury could reasonably discredit Appleby's adamant testimony that she could "clearly" tell from the tape he did not fall. (See Appleby Dep. at 209 ("[T]o me, he clearly opened the car door, stands up, closes the car door, walks in."); id. at 228 ("He does not fall.").)

Similarly, she cites Dr. Azar's note as evidence he did not fall, but his note states Lindner was limping, appeared to be in pain, and experienced painful "external rotation" of the hip. Contrary to Appleby's testimony, Dr. Azar's note *does* contain objective indications Lindner was injured. (See Appleby Dep. at 113 ("The objective was, I would assume, the tests that the doctor performed. All of those said 'negative,' 'negative,' 'negative.'"); id. at 36 ("there is not one objective" indication of injury).)

Third, the timing of Appleby's investigation could be considered suspicious. Although she states she was immediately "skeptical" of him, she did not take it upon herself to investigate the injury until approximately January 28, 2013, when he had suffered a second injury and taken the week off of work.

In addition to calling into question Appleby's professed good-faith belief, Lindner also offers evidence of an alternative motivation—his requests for time off. In her deposition, Appleby expressed concern over his previous requests for days off due to his or his family members' medical needs. She believed these absences constituted a "performance problem" and testified that if he continued to miss work for such "personal reasons," it could have led to his termination. Her description of these medically-motivated absences as a series of "unbelievable" "crises" and a "problem" could easily be interpreted as an aversion to allowing Lindner time off of work for medical problems.

This evidence of hostility combined with the timing of his termination and the shaky foundation for her professed belief could lead a reasonable jury to discredit Appleby and conclude her decision was in fact motivated by Lindner's medical leave. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993) ("The factfinder's disbelief

of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will permit the trier of fact to infer the ultimate fact of intentional discrimination."); Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 945 n.8 (8th Cir. 1994) ("[T]o survive summary judgment required only that plaintiff adduce enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if that evidence did not directly contradict or disprove defendant's articulated reasons for its actions.").

  Additionally, Lindner offers evidence that Donatelli's did not adhere to its standard policy when it terminated his employment. Appleby testified that Donatelli's had a "progressive discipline policy" and they "always give people the opportunity to—we would talk to them, tell them their consequences, talk to them again, tell them their consequences." (Appleby Dep. at 19.) She testified that they "always try to communicate with the employees." (Id.) Yet, she did not confront Lindner about her suspicion he was lying, allow him to explain himself, or otherwise communicate with him about it. Appleby also testified that Donatelli's gave other employees with behavioral problems the opportunity to attend TEAM—even employees who committed offenses she considered "flagrant" and an "automatic done" were first given the opportunity to attend TEAM before being discharged. (Id. at 18–20.) Yet, she never offered Lindner this option before dismissing him. Evidence like this—that "it was not the employer's policy or practice to respond to such problems in the way it responded in

the plaintiff's case"—may also prove pretext. Erickson v. Farmland Indus., Inc., 271 F.3d 718, 727 (8th Cir. 2001).

As Lindner has presented substantial evidence undermining Donatelli's proffered reason for firing him, the Court will deny summary judgment on his ADA/MHRA retaliation claim.

**II.   Workers' Compensation**

Lindner asserts two claims under the WCA. In the first, he asserts Donatelli's terminated his employment in retaliation for filing workers' compensation claims. The WCA prohibits retaliation against an employee for seeking workers' compensation benefits. Minn. Stat. § 176.82. To prove this claim, Lindner must show that his discharge was motivated by his workers' compensation claims. As the familiar McDonnell Douglas burden-shifting framework applies to this claim, see Miller v. CertainTeed Corp., 971 F.2d 167, 171 (8th Cir. 1992), the Court's analysis mirrors that of his ADA/MHRA retaliation claim, but with a few important differences.

Like the ADA claim, the parties do not dispute that Lindner engaged in protected activity (filing workers' compensation claims) and suffered an adverse employment action (his termination). Also like the ADA claim, Lindner relies on temporal proximity to establish a prima facie case. But for this claim, the timeline is different, as he was terminated two to three weeks after seeking workers' compensation benefits. The Eighth Circuit has held that a two-week gap between the protected activity and adverse employment action is "just barely" sufficient to support a prima facie case. Smith, 302 F.3d at 833 ("[W]e conclude that under our precedent [a two-week gap] is sufficient, but

just barely so, to establish causation."). So under Smith, Lindner needs more than just temporal proximity to establish causation, and this is where his claim falters.

Here, Lindner has no additional evidence establishing causation. He argues a jury could infer causation because Appleby knew workers' compensation claims increase Donatelli's insurance rates. But there is no testimony that she was concerned about that possibility. Nor is there evidence she believed firing Lindner would prevent the rates from rising as a result of his claims. Instead, the evidence is strongly contrary to causation—even Lindner acknowledges he was not intending to seek benefits for either injury and it was *Appleby* who raised the issue with him and told him to. He even told hospital staff he inhaled bleach "at a friend's house" in order to avoid triggering workers' compensation. If Donatelli's did not wish him to seek benefits as he alleges, then Appleby would not have encouraged him—unprompted—to file two claims.

Recognizing this flaw in his case, Lindner argues Appleby set him up by having him file a workers' compensation claim for his January 11th fall and then firing him for it. (See Pl.'s Mem. at 31.) But following this logic, Appleby was using the workers' compensation claim as an excuse to fire Lindner—meaning his filing the claim was *not* her true motivation. So even under this somewhat farfetched scenario, Lindner cannot establish a causal connection between his filing workers' compensation claims and Donatelli's firing him.

Lindner's second claim under the WCA is for Donatelli's refusal to "offer continued employment" to him as required under the Act. Minn. Stat. § 176.82, subd. 2. However, having concluded that Lindner has insufficient evidence that Donatelli's

discharged him for filing workers' compensation claims, this claim is moot. Lindner has cited nothing in the WCA that would prevent Donatelli's from discharging him for reasons unrelated to workers' compensation.

### III.    FMLA Entitlement

Finally, Lindner asserts a claim under the FMLA. The FMLA entitles an employee to twelve weeks of leave during any twelve-month period if he has a serious health condition that makes him unable to perform the functions of his job. See Hager v. Ark. Dept. of Health, 735 F.3d 1009, 1015 (8th Cir. 2013). It is "unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the statute. 29 U.S.C. § 2615(a)(1). There are three kinds of claims arising under the FMLA: entitlement, discrimination, and retaliation. Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1005 (8th Cir. 2012). Lindner asserts only an entitlement claim. An employer violates an employee's entitlement to FMLA benefits when it "refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the [FMLA]." Id. Lindner alleges Donatelli's prevented him from taking the full FMLA leave to which he was entitled by terminating his employment. To prevail on his claim, Lindner need not prove Donatelli's acted with a discriminatory animus in terminating him, only that it denied him a benefit to which he was entitled. Id.[3]

---

[3] Unlike discrimination and retaliation claims, entitlement claims are *not* analyzed using the McDonnell Douglas burden-shifting standard.

Donatelli's argues it "cannot have interfered with Lindner's FMLA request" because he "never" made one. (Def.'s Mem. at 21.) But this argument is clearly contradicted by the record. Lindner submitted a completed FMLA request form the day before he was terminated. And even if he hadn't made an official request, Donatelli's was clearly on notice of his potential need for FMLA leave because Appleby raised the issue with him and sent him FMLA paperwork, which stated he was eligible for leave beginning January 22. See Phillips v. Matthews, 547 F.3d 905, 910–11 (8th Cir. 2008) (employer was on notice of potential need for FMLA leave before employee had filed necessary paperwork); Thorson v. Gemini, Inc., 205 F.3d 370, 381 (8th Cir. 2000) ("Under the FMLA, the employer's duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave.").

Whether he was, in fact, entitled to FMLA leave is not specifically briefed by the parties. There is no dispute Lindner could not perform his job functions because of a medical condition. But as his doctors indicated he could not work in an environment with chemical smells, Donatelli's contends that his FMLA form was "in no way a request for leave" but essentially "a notice from Lindner that he could no longer work at Donatelli's as a result of his condition." (Def.'s Mem. at 22.) Assuming without deciding that Lindner was entitled to leave under the Act, his termination interfered with that entitlement. See Throneberry v. McGehee Cnty. Hosp., 403 F.3d 972, 980 (8th Cir. 2005) ("[E]very discharge of an employee while she is taking FMLA leave interferes with an employee's FMLA rights.").

The FMLA, however, is not a strict-liability statute, and Donatelli's is not liable if it proves Lindner's termination was wholly unrelated to his FMLA leave.  See Phillips, 547 F.3d at 911.  Donatelli's has offered evidence that its decision was motivated by Appleby's belief that Lindner had lied about his January 11th workplace injury and, as Lindner's FMLA request was a result of a separate injury, Donatelli's proffered reason is unrelated to the FMLA claim.  Whether the January 11th injury was the *only* reason Donatelli's fired Lindner is an issue of fact for a jury to decide.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Donatelli's Motion for Summary Judgment (Doc. No. 29) is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1)  The Motion is **GRANTED** as to Counts 2, 3, 4, 6, and 7, which Counts are **DISMISSED WITH PREJUDICE**; and

(2)  The Motion is **DENIED** as to Counts 1, 5, and 8.

Date:  August 11, 2014

                                                          s/Richard H. Kyle
                                                          RICHARD H. KYLE
                                                          United States District Judge